IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

REX BROWN,

            Plaintiff,

    vs.

WEST CORPORATION,

            Defendant.

8:11CV284

ORDER

This matter is before the court on the March 7, 2013, referral from Senior Judge Lyle E. Strom of the parties' discovery dispute regarding the extent of the defendant's obligation to produce Electronically Stored Information (ESI). **See** Filing No. 100. The undersigned magistrate judge conducted two telephonic hearings, on April 3, 2013, and August 7, 2013, about the dispute. Additionally, the plaintiff filed a brief (Filing No. 106) and an index of evidence (Filing No. 107), and the defendant filed a brief (Filing No. 108) and an index of evidence (Filing Nos. 109 and 110) in support of their positions. The parties also referred the court to the filings related to the plaintiff's September 7, 2012, Motion to Compel (Filing No. 34), including the court's November 5, 2012, Order (Filing No. 85) and subsequent March 5, 2013, hearing (Filing No. 105), which are relevant to the current and ongoing dispute.

BACKGROUND

The plaintiff filed the instant action on August 17, 2011, alleging he suffered a racially hostile work environment and "outrageous conduct," including racial and ethnic slurs, during his employment with the defendant until his wrongful termination in violation of public policy. **See** Filing No. 1 - Complaint. Although discovery has been ongoing in this case since the Fall of 2011, the parties dispute the depth of discovery necessary from electronic sources. Specifically, the parties dispute which search terms are relevant and which custodian's computers must be searched as part of the defendant's obligation to produce ESI. A determination of the relevance of each search term and custodian is inescapably fact specific. Accordingly the following detailed

recitation of the plaintiff's allegations provides the basis for the court's relevance analysis.

In September 2004, the plaintiff, an African-American male, began working as a Director of Sales (DOS) at the defendant's corporate headquarters in Omaha, Nebraska. **See** [Filing No. 1](#) - Complaint ¶¶ 3, 5. The defendant "is in the telecommunications business, and [the plaintiff] sold customer contact solutions to various clients." *Id.* ¶ 5. A Sales Compensation Agreement governed the plaintiff's employment and the amount of commissions he received for business sold. *Id.* The plaintiff was one of six DOS and the only African-American DOS. *Id.* ¶ 6. "[T]wo other people of color, Robert Herrington, a marketing analyst, and Christine Rodriguez, an administrative assistant" also worked on the defendant's executive floor with the plaintiff. *Id.* The plaintiff's supervisor was John Thielen (Thielen), Vice President of Sales (VPS), whose supervisor was Mike Sturgeon (Sturgeon), Executive Vice President of Sales (EVP). *Id.* ¶¶ 6-7.

Shortly after beginning his employment, the plaintiff encountered Sturgeon at the coffee station and asked, "Hey, that is a neat coffee cup you have, where can I get one like that?" *Id.* ¶ 7. Sturgeon replied, "You can't. You go over there and get you a cup where the colored people get their cups from." *Id.*

In the first few weeks after the plaintiff began his employment, Tony Morrison (Morrison), a Caucasian sales account manager, called the plaintiff "boy" or said "hey boy." **See** [Filing No. 51-5](#) - Brown Depo. p. 26-36. The plaintiff responded by telling Morrison not to do that or it was not funny. *Id.* Morrison smirked or laughed and walked away. On the fourth occasion, Morrison called out "Hey, Boy," then, when the plaintiff did not respond, Morrison called, "Hey, I'm talking to you, Rex." **See** [Filing No. 1](#) - Complaint ¶ 8 (undated in the Complaint). The plaintiff immediately told Morrison that he (the plaintiff) "didn't appreciate his comment and that he did not want to ever hear that word again." *Id.* The same day, the plaintiff reported to Thielen that he did not like Morrison calling him boy and it was inappropriate. **See** [Filing No. 51-5](#) - Brown Depo. p. 37. Thielen did not respond, but approximately one week later, Morrison apologized to the plaintiff. *Id.* at 35, 37-38.

In November of 2008, at a local restaurant during a work-related function the plaintiff came upon a conversation between Thielen, EVP Doug Debolt (Debolt), and Jody Kistaitis (Kistaitis), a Caucasian male DOS. **See** [Filing No. 1](#) - Complaint ¶ 9. The group was discussing the potential hiring of Turner Gill, an African American male, as the head football coach at the University of Nebraska. *Id.* Kistaitis began to say, "If that nigg…," but Thielen noticed the plaintiff approaching and nudged Kistaitis, who finished his sentence by stating, "I'll get rid of my tickets, if they hire [Gill]." *Id.*

The plaintiff enjoyed a positive business relationship with Eric Covington (Covington), an African-American male, who was employed as a Senior Vice President of Sales for Ceridian Corporation (Ceridian), the defendant's related business partner. *Id.* ¶ 11. Even so, throughout the course of his employment, there were several comments made to the plaintiff about how Covington was difficult to work with. *Id.* Additionally, Skip Hanson (Hanson), President of Communications Services, and Matt Driscoll (Driscoll), EVP of Communications Services, both Caucasian, "frequently referred to the plaintiff as 'Eric' drawing from the racially motivated slur that all African-American males look alike." *Id.*

The plaintiff alleges Thielen would often invite Kistaitis and DOS Ted Fortezzo (Fortezzo) to business lunches and marketing and social gatherings while excluding the plaintiff. *Id.* ¶ 10. "Sales opportunities, marketing and product information was regularly shared at these business lunches or social gatherings which would put Brown at a distinct disadvantage regarding sales." *Id.* Thielen often said to the plaintiff, "Why can't you be more like Jody and Ted?" *Id.* Additionally, Thielen discounted the plaintiff's comments in favor of the comments made by Kistaitis and Fortezzo during business meetings. *Id.* ¶ 14.

Throughout the course of his employment, Thielen and other members of senior management routinely harassed the plaintiff about his work hours. *Id.* ¶ 12. Specifically, Thielen verbally disciplined the plaintiff for beginning the work day between 8:15 and 8:25 a.m., despite a later time for other Caucasian DOS and senior management. *Id.* Additionally, Thielen "harassed [the plaintiff] for leaving work to move his vehicle from the far parking lot to the parking lot that is closer to the building during the work day," after Kistaitis complained to Thielen, even though the plaintiff only

3

infrequently left work for lunch or other personal reasons. *Id.* By contrast, the plaintiff alleges, Caucasian DOS frequently took long lunches and tended to personal business during the workday but were not subject to scrutiny or verbal harassment. *Id.* Thielen advised the plaintiff he was expected to be in the office during the day as long as possible prior to leaving for business-related travel, however Kistaitis and Fortezzo were allowed to leave for the airport from their homes. *Id.* ¶ 13.

The plaintiff alleges his work and expenses were scrutinized more closely than his co-workers. Near the end of the plaintiff's employment, Thielen required the plaintiff to copy Thielen on all customer contact e-mails and get updates about the customers from the defendant's contact support personnel. *Id.* ¶ 13. Additionally, Thielen and Sturgeon told the plaintiff each DOS had to pay for his own cell phone expense even though the plaintiff asked for assistance with the expense on several occasions. *Id.* ¶ 38. An administrative assistant told the plaintiff Thielen authorized payment of Kistaitis and Fortezzo's phone bill, which Thielen denied to the plaintiff. *Id.* On another occasion, Thielen ridiculed the plaintiff for parking in an expensive parking lot at the airport, prompting the plaintiff to withdraw the expense submission. *Id.* ¶ 39. The administrative assistant asked the plaintiff why he was withdrawing the submission, then stated, "What kind of bullshit is that. You should see the shit that comes through my desk from Jody (Kistaitis) and Ted (Fortezzo)." *Id.* The plaintiff "later found out that Kistaitis and Fortezzo often submitted receipts for lunches and social gatherings but never received the same kind of heightened scrutiny from Thielen." *Id.*

The plaintiff alleges the defendant did not provide support to him for sales opportunities. *Id.* at 6-9. Initially, Herrington took incoming sales calls and fairly distributed the calls to all DOS. *Id.* ¶ 19. In 2007, Kistaitis and Fortezzo complained Herrington did not give them enough sales leads. *Id.* ¶ 20. Thielen circumvented the fair distribution system to give Kistaitis and Fortezzo more and better quality sales leads. *Id.* ¶¶ 20-21. Additionally, Thielen, Debolt, and VPS Phil Krohn (Krohn) criticized the plaintiff's ability to generate opportunities and extensively questioned him and Herrington when the plaintiff established good qualified opportunities. *Id.* ¶¶ 20-25. Debolt discouraged other employees from cooperating in a meeting the plaintiff scheduled with a customer. *Id.* ¶ 24.

The plaintiff alleges the defendant's senior leadership went out of their way to make the plaintiff's life difficult by failing to support his work. *Id.* at 9-13. The plaintiff gave several specific examples. First, the plaintiff alleges his clients were charged "exceedingly" higher prices than the clients of Kistaitis and Fortezzo. *Id.* ¶ 26. The inconsistent pricing negatively affected sales opportunities with Ceridian/Comdata, Schering Plough, and Computer Sciences Corporation (CSC). *Id.* ¶ 26.

Second, after the plaintiff's efforts secured the defendant as one of the finalists for a job with a Canadian utility company, ATCO I-TEK, who wanted to relocate its customer support center to the Philippines. *Id.* ¶¶ 27-28. The plaintiff received the contact from the Managing Director for Equa Terra, Cliff Justice (Justice), who informed the plaintiff about the high importance to ATCO I-TEK of having senior management involved at sales meetings. *Id.* ¶ 27. Despite the importance, Mark Frei (Frei), SVP of Sales, said it was Driscoll's area and Driscoll, the EVP for the Philippines, said he could not attend because he was too busy with other matters even though he later sent an email out inquiring whether there were any clients he could meet with during his trip to the Philippines. *Id.* ¶¶ 27-28.

Third, the plaintiff received another opportunity through Equa Terra for an account with Oncor's electric division. *Id.* ¶ 29. After Thielen refused to attend a bidder's conference, Frei attended and spoke with an executive from Oncor who stated it was important for any Oncor business partner to "practice and embrace diversity" and later said he could tell the defendant had the experience Oncor was looking for. *Id.* ¶ 30. In a later meeting about the opportunity, Frei told others about the diversity comment at which time Rick Culbertson (Culbertson), SVP of Operations, rolled his eyes. *Id.* Frei told the plaintiff they would not bid on the opportunity because, "We don't have diversity here" and the others agreed. *Id.* Within two weeks of the decision, the defendant approved Kistaitis' request to bid on a job with Oncor's gas distribution division. *Id.*

Fourth, in 2008 and 2009, the plaintiff was working with Covington to establish a strategic partnership with Ceridian's benefits division, whose owner also owns True Green Chemlawn and the defendant. *Id.* ¶ 31. Thielen refused to meet with Covington stating, "Oh, that's just Eric trying to get better pricing, and we don't want any more

5

business from him if he's going to be difficult." *Id.* Senior management "scoffed at the potential opportunity and did not meet the committed time lines they provided to Ceridian," causing the defendant to lose the opportunity. *Id.* By comparison, Kistaitis bid an opportunity with True Green Chemlawn with the assistance of the entire sales team, including Thielen, Frei, and Debolt, and the operations team, including Hanson, Driscoll, and Dan Hicks (Hicks) VP of Operations, and the marketing department who developed special marketing. *Id.*

The plaintiff alleges the defendant failed to provide his clients with operational support leading to lost business on at least three occasions. *Id.* at 13-14. First, in 2008, Hicks made commitments to GE Capital after the general manager, Ed Faulstick, (Faulstick), agreed to all of the defendant's requirements to make the project work. *Id.* ¶ 34. After twelve weeks, the operations team said they would not do the work. *Id.* Second, the plaintiff secured a small account with CSC, which led the Lawrence Caruso (Caruso), a CSC partner, to seek a strategic relationship with the defendant. *Id.* ¶ 35. Caruso introduced the Schering-Plough customer support opportunity to the defendant. *Id.* Schering-Plough initially agreed to revenue minimums required by the defendant even though the defendant did not require revenue minimums for any other DOS's client. *Id.* Schering-Plough canceled service when it could not get proper operations support even after the director, Pete Hickman, traveled to Omaha to request the defendant's operational support. *Id.* ¶ 36. The plaintiff alleges "[o]ther programs being maintained by other sales directors at West always received proper operations support." *Id.* Third, the plaintiff sought an opportunity with Schering-Plough for West At Home, but sold the contract to West Business Services (WBS). *Id.* ¶ 37. Thielen informed the plaintiff he would have to pay back any commissions because the defendant did not want to pay the plaintiff for re-selling the contract even though "Fortezzo and Kistaitis had been selling services that were leaving West to other business units for mortgage services time and time again and received commissions on the re-sale." *Id.*

The plaintiff alleges he complained to Thielen and Sturgeon "on more than one occasion" about the hostile work environment and disparate treatment he received in comparison to Kistaitis and Fortezzo. *Id.* ¶¶ 17, 23. The plaintiff alleges Thielen and Sturgeon did not make any attempts to investigate or rectify the situations. *Id.* In

6

November or December of 2009, the plaintiff complained to both Thielen and Sturgeon about disparate treatment. *Id.* ¶ 40. Sturgeon told the plaintiff, "Look, John is a part of my team and if he wants to fire you, I don't give a f___. You just need to do what he tells you and don't complain." *Id.* Following the meeting with Sturgeon, Thielen told the plaintiff, "Don't ever go to my Boss's office again." *Id.* In January 2010, Thielen met with the plaintiff to say "things were not working out." *Id.* ¶ 41. Thielen explained the plaintiff could be put on a plan to develop new logos or resign. *Id.* Thielen further explained that if the plaintiff did not resign he would not receive the approximately $48,000 of outstanding commissions which were due related to the 2009 fiscal year on the Schering-Plough account. *Id.* The plaintiff alleges he was forced to resign, effective May 28, 2010, because of the hostile work environment, unfair treatment, and continual lack of support for his work. *Id.* ¶ 42.

Based on these allegations, the plaintiff asserts claims arising from Title I of the Civil Rights Act, 42 U.S.C. § 1981: racially hostile work environment (Claim I), discrimination in terms and conditions of employment (Claim II), discrimination in discharge (Claim III), and retaliation for engaging in protected activity (Claim (IV).

## ANALYSIS

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Broad discovery is an important tool for the litigant, and so '[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.'" *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1039 (8th Cir. 2011) (alteration in original) (**quoting** Fed. R. Civ. P. 26(b)(1)). Accordingly, relevant information includes "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe with a reasonable degree of specificity, the information they hope to obtain and its importance to their case. **See** *Cervantes v. Time, Inc.*, 464 F.2d 986, 994 (8th Cir. 1972).

Once the requesting party meets the threshold relevance burden, generally "[a]ll discovery requests are a burden on the party who must respond thereto. Unless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden." ***Continental Ill. Nat'l Bank & Trust Co. of Chicago v. Caton***, 136 F.R.D. 682, 684-85 (D. Kan. 1991) (citation omitted). The party opposing a motion to compel has the burden of showing its objections are valid by providing specific explanations or factual support as to how each discovery request is improper. ***St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.***, 198 F.R.D. 508, 511-12 (N.D. Iowa 2000) (objecting party has the burden to substantiate its objections). The party resisting discovery has the burden to show facts justifying its objection by demonstrating that the time or expense involved in responding to requested discovery is unduly burdensome. **See *Wagner v. Dryvit Sys., Inc.***, 208 F.R.D. 606, 610 (D. Neb. 2001). This imposes an obligation to provide sufficient detail and explanation about the nature of the burden in terms of time, money, and procedure required to produce the requested discovery. **See *id.***

Generally, the court has authority to limit the scope of discovery. ***Roberts v. Shawnee Mission Ford, Inc.***, 352 F.3d 358, 361 (8th Cir. 2003). The Federal Rules authorize the court to limit discovery that is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). Moreover, the court may also limit discovery after considering "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii). The Federal Rules provide additional limitations on ESI discovery. Specifically,

> A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may

8

> nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

Fed. R. Civ. P. 26(b)(2)(B).

The defendant argues the plaintiff failed to serve a reasonable and legitimate discovery request for ESI. **See** Filing No. 108 - Brief p. 3. The plaintiff sought copies of all "electronic communication . . . that refers to the plaintiff or to any issue in this case." **See** Filing No. 110 - Ex. C Request for Production No. 13. The defendant asserted various objections to this request and stated, "Subject to and without waiving the above objections, responsive and non-privileged documents will be produced subject to the terms of the Agreed Protective Order entered by the Court." *Id.* Additionally, the plaintiff sought documents from e-mail searches for custodians Sturgeon, "Thieland," Stangl, Hanson, Debolt, Kistaitis, Fortezzo, Morrison, and Penny Majeski for a list of thirty-six search terms, primarily the terms sought in association with the current dispute. *Id.* - Ex. D Second Set Request for Production No. 4. The defendant asserted various objections to this request and stated,

> Subject to and without waiving the above objections, as Mike Sturgeon is no longer employed at West and is alleged to have made a racially derogatory remark to Plaintiff, West agreed to search Mike Sturgeon's computer for terms up through the term "cotton picker" and did not find any responsive documents. West has further requested that Plaintiff propose terms for search of the above-named individuals' computers that are reasonable, have some relation to the individual's role in the case, and are properly tailored.

*Id.*

On November 5, 2012, the Honorable Lyle E. Strom determined the plaintiff's requests were sufficient to place the burden on the defendant to provide relevant ESI. **See** Filing No. 85 - Order p. 2-7. The court left open the determination of the terms and sources for additional production. *Id.* at 5-6. Furthermore, "[a]n objection to part of a request must specify the part and permit inspection of the rest." Fed. R. Civ. P. 34(b)(2)(C). For these reasons, the court finds the defendant has a general obligation under the plaintiff's requests and the discovery rules to produce relevant unprivileged

9

responsive ESI.  The court will evaluate the relevance of the source custodians and and specific terms below.

### A. Custodians

The plaintiff provided the court with a list of twenty-six custodians.  **See** Filing No. 106-1 Ex. B.  According to the defendant, four of the proposed custodians are no longer employed by the defendant and it does not have their computers.  John Thompson's (Thompson) computer had been cleaned and repurposed prior to the plaintiff's resignation.  **See** Filing No. 108 - Brief p. 4 n.2.  Similarly, Chris Paul left his employment with the defendant in May 2012.  *Id.*  The defendant represents it has confirmed Paul's computer "had no documents relevant to the allegations that had not already been produced."  *Id.*  Although the plaintiff lists Thompson and Paul as a potential trial witnesses and as "comparable sales directors," the plaintiff provides no additional factual support or argument suggesting additional relevant ESI from Thompson or Paul's computers exists or is accessible.  The defendant represents Morrison's employment terminated in May 2012, a post-litigation search indicated Morrison's computer "had no documents relevant to the allegations that had not already been produced," then his computer was cleaned and repurposed.  *Id.*  Morrison, a comparable sales director, had referred to the plaintiff as "boy" on four occasions in the first few weeks of the plaintiff's employment (Filing No. 1 - Complaint ¶ 8 (undated); Filing No. 51-5 Depo. 26-35) and had provided "negative feedback" about the plaintiff (Filing No. 94-15 Ex. 15 Oct. 5, 2006, Email stating, "Is it just my bad luck or does Rex have great luck.  Did you know that 9 of his Top 25 have come from Robert?").  The plaintiff provides no additional factual support or argument suggesting additional relevant ESI from Morrison's computer exists or is accessible.  **See** Filing No. 108 - Brief p. 4 n.2.  The defendant represents Teresa Menking's (Menking) employment terminated in July 2012, a post-litigation search indicated Morrison's computer "had no documents relevant to the allegations that had not already been produced," then her computer was cleaned and repurposed.  *Id.*  Although the plaintiff lists Menking as a potential trial witnesses and as an "accounting representative involved in Plaintiff's account billing," the plaintiff provides no additional factual support or argument

10

suggesting additional relevant ESI from Menking's computer exists or is accessible. Therefore, the court will not compel the defendant to conduct the searches requested for Thompson, Paul, Morrison, and Menking.

The plaintiff generally argues the remaining proposed custodians are "key" to this case and may have discoverable information. **See** Filing No. 35 - Brief in support of motion to compel p. 20-22; ***see also*** Filing No. 106 - Brief p. 5-6. The plaintiff describes the custodians within groups such as supervisors, comparators, business leaders, human resources/affirmative action coordinators, and/or support staff [who] dealt with either Plaintiff or the issues in this case – leads, sales, budgeting, billing, commissions or certain transactions." *Id.* at 6-7. Further, the plaintiff states, "Many of these people would have either sent or received communications regarding [the plaintiff]." *Id.* at 7. Many of these individuals also contributed negative feedback to Mr. Thielen" about the plaintiff. *Id.* These general statements are insufficient to show the relevance of the requested discovery. Whether an individual who worked with the plaintiff has discoverable information is a completely separate issue from whether the defendant will be compelled to conduct an independent search on such individual's computer for every piece of ESI related to the plaintiff or his allegations. The plaintiff's proposed list of custodians is unreasonably broad including proposed custodians with only a remote connection to the plaintiff. For example, if these individuals sent communications to Thielen, as alleged, a search of Thielen's computer will uncover the communications without also searching each of the sender's computers. Moreover, the plaintiff provides no basis for searching each of the custodian's computers at substantial expense rather than engaging in pointed discovery such as depositions of the individuals themselves. At this time, the plaintiff offers only speculation, without any reasonable degree of specificity, that the requested discovery will bear on issues in this case. In any event, should a thorough search of Thielen's computer or some other discovery reveal the need for additional searches on other custodian's computers, the plaintiff may explore those options at that time. Accordingly, the court will not require the defendant to conduct the ESI searches requested for Culbertson, Donna Wilcox, Kistaitis, Fortezzo, Patricia Kemler, Christine Rodriguez, Krohn, Penny Majeski, Steve Stangl, Debolt,

Rhonda Gibler, Driscoll, Hicks, Hanson, Frei, Jesse Troestler, Connie Hildabrand, Denise Kellar, Timothy Wichita, and Rebeca Buzbee.

By contrast, the plaintiff has met his burden of showing the requested searches with respect to Thielen and Sturgeon are reasonably calculated to lead to the discovery of matter that bears on or reasonably could lead to other matter that could bear on the issues in this case. The plaintiff's allegations suggest Thielen and Sturgeon were aware of ongoing racial harassment and unfair treatment. More important to the current discovery dispute, the evidence reveals these decision makers regularly sent and received emails about the plaintiff, his work, and the allegations raised in the complaint. Specifically, some of the emails already produced are relevant to Thielen's "assessment of and attitude toward the plaintiff and, by proxy, Thielen's ultimate motives for any disparate treatment." **See** Filing No. 85 - Order p. 6. These previously produced emails suggest additional searches with additional terms are reasonably likely to lead to discoverable evidence.

The defendant represents it "made a copy of the contents of Mr. Sturgeon's computer at the time of his resignation" and "[o]utside counsel's office" has conducted a basic search of the contents using the terms Rex, Brown, Rex Brown, and each of the racial slurs and terms on the plaintiff's Ex. A. **See** Filing No. 110 - Ex. A p. 4 Custodian List. Additionally, the defendant states it has produced all responsive documents and no documents were located with the racial slurs and terms. *Id.* Based on these representations no additional searches of Sturgeon's computer appear warranted.

The defendant represents it has conducted a "forensic search" of Thielen's computer for any documents with the terms Rex, Brown, and Rex Brown. **See** Filing No. 110 - Ex. A p. 4 Custodian List. Additionally, Thielen provided an affidavit describing the searches he conducted. **See** *id.* p. 35 Ex. A-8 Thielen Aff. The defendant contends the previously produced documents fail to reveal any racial animus or bias toward the plaintiff, but do reveal a growing frustration with his performance. **See** *id.* Ex. A p. 4 Custodian List. The extent of the defendant's and Thielen's searches for responsive discovery are insufficiently broad or insufficiently explained to preclude additional efforts.

Accordingly, the defendant shall supplement the discovery after conducting additional searches with respect to Thielen's computer. The parties indicated to the undersigned magistrate judge they will confer to resolve outstanding "protocol" disputes, which are significantly curtailed by the court's resolution of the search term and custodian issues.

**B.     Racial and Other Terms**

The plaintiff provided the court with a custodian and search term proposal listing each computer custodian with a series of terms specific to each custodian. **See** Filing No. 106-1 Ex. B. Attached with the proposal is a search terms list. **See** *id.* Ex. A. In the search terms list, the plaintiff proposes a list of twenty-four terms, which he calls "racial terms." *Id.* The terms listed are: nigger, sambo, nigga, black, boy, black folks, black people, blass ass, monkey, monkey boy, negro, coon, jungle bunny, porch monkey, colored, homie/homey, Canadian, nappy, cotton picker, diversity, affirmative action, discrimination, harassment, and race. *Id.* The list also includes nineteen other terms referencing individuals and transactions: Eric Covington, Cliff Justice, Ed Faulstick, Lawrence Caruso, Mike Shea, Pete Hickman, Phil Spampinato, Oncor, Ceridian, ATCO-Itek, Equaterra, Mark Vaughn, Robert Herrington, Troy Eaden, Obama, President Obama, Rex, Brown, and Rex Brown. *Id.* The search term list includes a short reference or description for most of these nineteen terms such as an associated paragraph in the Complaint or other filing. *Id.* There are some terms absent from the search terms list which do appear the proposal list: Rexy, Abbott, Sears, ain't, thas, scribblin', Comdata, cell phone, Insulet, Merck, Schering, TXU, Turner Gill. *Id.* Ex. B.

As discussed above the additional search will be limited to Thielen's computer. In connection with Thielen's computer the plaintiff seeks searches including "[a]ll terms on the original list, with the exception of democrats. . . . [and] the term Ceridian. Additionally, Robert Herrington, Mark Vaughn, Troy Eaden, ain't, and thas." *Id.* The plaintiff suggests "[t]his is a race discrimination lawsuit; therefore, racial terms would be relevant." **See** Filing No. 106 - Brief p. 6. More specifically, the plaintiff alleges Thielen

used racial language,[1] was involved in a discussion where Turner Gill was referred to by using a racial slur, and "decision-makers spoke negatively of President Obama."[2]  *Id.*

The plaintiff fails to show with any degree of specificity how most of these terms are reasonably calculated to lead to the discovery of relevant ESI.  Mark Vaughn was an African-American sales director employed with the defendant.  **See** Filing No. 106 - Brief p. 6.  The plaintiff suggests no other connection he may have to the plaintiff's claims.  Additionally, the mere reference to Turner Gill by using a racial slur on one occasion by someone other than Thielen outside of work does not justify using Gill's name as a search term.  Similarly, comments critical of the U.S. President's administration, even though the President is African-American, does not justify using his name to search Thielen's computer.  The plaintiff has failed to show these terms and most of the remaining terms have any connection to the facts of the plaintiff's lawsuit such that a search using those terms would reveal relevant discovery.  There are no allegations the racially derogatory terms were used by anyone, except for boy and "nigg," which were used in spoken language, not in writing.  Further the plaintiff gives no basis for how the derogatory terms or more general terms might give rise to the discovery of relevant ESI.  The more general terms "ain't" and "thas" are contained in an email conversation between Thielen and Fortezzo, which email the plaintiff already has.  No additional search for these two terms will be required.  Accordingly, the court will not require the defendant to conduct a search with these terms.

The plaintiff seeks to include Troy Eaden (Eaden) as a search term due to a telephone voicemail he left for the plaintiff on August 22, 2011, five days after the plaintiff filed this lawsuit.  **See** Filing No. 93 - Mar. 4, 2013, Brief p. 8.  Eaden is a former

---

[1] The plaintiff relies heavily on some emails found on Thielen's computer after a search using the plaintiff's name.  For example in an email copied to Thielen, Fortezzo informed a client, "We charges $17.50 per hour . . ."  **See** Filing No. 94-21 p. 7 Dec. 11, 2009, Email.  In response to that incorrect grammar usage and another mistake, Thielen sent an email to Fortezzo saying, "Thas good boss."  *Id.* at 6.  Fortezzo replied, "You ain't got no times for me . . . you be working with JK Beebs & Rex 24/7 so my scribblin' skills are showing to da client."  *Id.*  As another example, the plaintiff received some recommendations from a co-worker about a proposal for a client.  **See** Filing No. 94-27 p. 8 Oct. 24, 2007, Email.  The co-worker's recommendations' email contained a couple grammatical errors, such as inappropriately using "there" instead of "their."  *Id.*  The plaintiff forwarded the recommendations to Thielen and stated, "I will put this in a format that will be more like a proposal to send to Steve."  *Id.*  Thielen replied, "Does he speak English?"  *Id.*

[2] The plaintiff supplied an affidavit stating, "[o]n various occasions throughout my employment at West, Mike Sturgeon, John Thielen, Mark Frei, and Jody Kistaitis were very critical of the Obama administration and the democratic party leadership."  **See** Filing No. 71-2 Brown Aff. ¶ 2.

executive for the defendant. **See** [Filing No. 108](#) - Brief p. 9. In the voicemail, Eaden expresses his dissatisfaction with the plaintiff for filing the lawsuit and indicates that he had done the plaintiff a favor by recommending to the defendant the plaintiff be hired despite his lack of sales experience. **See** Filing No. 57 - Audio Recording. Additionally, Eaden indicates he heard about it from people who worked at the defendant who would fight the allegations; was going to encourage individuals at the defendant to review the plaintiff's compensation and recover anything out of line; and the plaintiff would not find other employment in Omaha, Nebraska, after the "little stunt" he pulled. *Id.* The plaintiff argues this voicemail "constitutes classic retaliation for filing a discrimination lawsuit," which supports a post-litigation ESI search regarding communications between the defendant's personnel, generally, and especially communications with Eaden. **See** [Filing No. 93](#) - Mar. 4, 2013, Brief p. 8. The defendant opposes the request because Eaden was not associated with the defendant at the time of the call and there is no evidence of post-litigation retaliation. **See** [Filing No. 108](#) - Brief p. 9. The plaintiff fails to sustain his burden of showing Eaden is relevant as a term. The plaintiff's retaliation claim is not associated with any conduct occurring after the lawsuit was filed. Furthermore, the voicemail specifically and explicitly states it is Eaden's opinions rather than his representation of the defendant's position on the plaintiff or the lawsuit. The plaintiff fails to provide any evidence any particular custodian spoke with Eaden or would have any ESI related to the conversation relevant to the plaintiff's claims or otherwise. Moreover, there are less burdensome ways to determine the information sought, if it is relevant. Accordingly, the court will not require the defendant to conduct a search with Eaden as a term.

The plaintiff has met the minimum threshold for allowing a search on the remaining terms because they may lead to relevant discovery bearing on the defendant's defenses and the plaintiff's claims related to discrimination and disparate treatment, specifically his employment, his clients, and lead distribution. Such terms are: Eric Covington, Cliff Justice, Ed Faulstick, Lawrence Caruso, Mike Shea, Pete Hickman, Phil Spampinato, Oncor, Ceridian, ATCO-Itek, Equaterra, and Robert Herrington. The defendant has failed to show a search of Thielen's computer for these limited terms is overly burdensome. Accordingly,

**IT IS ORDERED**:

As part of the defendant's obligation to produce ESI, it shall complete a search of Thielen's computer for the terms Eric Covington, Cliff Justice, Ed Faulstick, Lawrence Caruso, Mike Shea, Pete Hickman, Phil Spampinato, Oncor, Ceridian, ATCO-Itek, Equaterra, and Robert Herrington. The plaintiff's request for additional custodians and terms is denied as set forth above.

## ADMONITION

Pursuant to [NECivR 72.2](#) any objection to this Order shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Order. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 16th day of August, 2013.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge